IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

| | | |
|---|---|---|
| VANESSA RAE GOODRICH, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 2:14-27225** |
| | ) | |
| CAROLYN W. COLVIN , | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| **Defendant.** | ) | |

PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. By Standing Orders entered October 27, 2014, and January 5, 2016 (Document Nos. 4 and 14.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). This case presently is pending before the Court on the parties cross-Motions for Judgment on the Pleadings (Document Nos. 11 and 12.) and Plaintiff's Response. (Document No. 13.)

The Plaintiff, Vanessa Rae Goodrich, (hereinafter referred to as "Claimant"), filed an application for SSI on August 29, 2011 (protective filing date), alleging disability as of January 1, 2011, due to back problems and anxiety. (Tr. at 108, 276-81, 290, 294,.) The claim was denied initially and upon reconsideration. (Tr. at 56-57, 65-67, 73-75.) On February 9, 2011, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 76-78.) A hearing was held on March 26, 2012, before the Honorable Jack Penca. (Tr. at 26-54.)   By decision dated March 30, 2012, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 15-25.) The ALJ's

decision became the final decision of the Commissioner on June 12, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) Claimant filed the present action seeking judicial review of the administrative decision on July 16, 2013, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2012). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful

activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.   20 C.F.R. §§ 404.1520(f), 416.920(f) (2012). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning;

concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1). [1] Fourth, if the claimant's

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since September 7, 2010, the application date. (Tr. at 17, Finding No. 1.) Under the second inquiry, the ALJ found that Claimant suffered from "right eye blindness, mood disorder not otherwise specified (NOS), personality disorder NOS, and polysubstance dependence and abuse," which were severe impairments. (Tr. at 17, Finding No. 2.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 17, Finding No. 3.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform medium level work, as follows:

> [T]he [C]laimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except he can perform tasks requiring only occasional visual acuity and no depth perception. He can tolerate occasional changes in the work setting and occasional supervision. He can have occasional interaction with coworkers but no interaction with the public.

(Tr. at 19, Finding No. 4.) At step four, the ALJ found that Claimant had no past relevant work. (Tr. at 23, Finding No. 5.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a laundry worker, dry cleaner helper, and laundry bagger at the unskilled medium level of exertion. (Tr. at 23-24, Finding No. 9.) On this basis, benefits were denied. (Tr. at 24, Finding No. 10.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was born on July 10, 1966, and was 46 years old at the time of the administrative hearing, March 26, 2012. (Tr. at 23, 159.) Claimant had at least a high school education and was able to communicate in English. (Tr. at 23, 226, 227-28.) Claimant's past work did not constitute substantial gainful activity. (Tr. at 23, 47-48.)

 The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence of record, and will discuss it below as it relates to the undersigned's findings and recommendation.

From January 13, 2009, through June 10, 2010, treated at Roane County Family Health Care for her mental and physical impairments. (Tr. at 391-406.) On January 13, 2009, Heather Paxton, M.A., Ed.S., Supervised Psychologist, noted Claimant's reports that her doctors thought she was "doctor shopping" to obtain drugs and that she worried they did not take her complaints serious. (Tr. at 391.)

On November 9, 2009, an MRI of Claimant's thoracic spine revealed mild disc degeneration and desiccation with a small disc bulge at T10-11. (Tr. at 374.) The disc bulge indented the thecal sac anteriorly. (Id.) There was no sign of spinal stenosis or neural foraminal narrowing. (Id.) The MRI scans of the lumbar and cervical spines were normal. (Tr. at 375-76.)

On June 10, 2010, Claimant saw Dr. Charles F. Chong, M.D. (Tr. at 403-04.) She reported sharp, stabbing back pain and stiffness in the lower back region. (Tr. at 403.) Claimant also reported mid upper back pain. (Id.) Her pain was worse in the evenings after working. (Id.) She stated that her physician, Dr. Metzger was not doing anything to help her with the pain. (Id.) Neurological examination was unremarkable and Dr. Chong assessed back pain, adjustment disorder with anxiety, and depressed mood. (Id.) He recommended physical therapy and prescribed

Flexeril. (Id.)

On August 5, 2010, Claimant was examined by Dr. Timothy P. Metzger Sr., D.O., at Roane County Medical Clinic, for complaints of anxiety and heartburn. (Tr. at 367-69.) She was prescribed Klonopin 1mg, Vistaril 50mg, and Zantac 150mg. (Tr. at 369.) From November 5, 2010, through February 28, 2011, Claimant was examined on five occasions for complaints of depression and anxiety, which included a fear that someone who had threatened her eleven year old daughter would hurt her. (Tr. at 344-63.) Claimant also had some reports of wrist pain and tenderness and low back pain. (Tr. at 344, 357.) On September 8, 2011, Claimant presented for follow-up examination of anxiety and complained of headaches with a one week history, as well as back and neck pain that had increased over the last three months. (Tr. at 340-43.) On examination, Dr. Metzger observed tenderness of the neck and thoracic and lumbar spine. (Tr. at 342.) Mental status exam was unremarkable. (Id.) He assessed muscle spasm, anxiety, and tension type headache, for which he prescribed Flexeril 10mg, Celexa 20mg, and Floricet 325, and continued her Klonopin 1mg. (Tr. at 342-43.) On December 9, 2011, Dr. Metzger noted Claimant's reports of moderate low back pain, and noted that Claimant's anxiety was controlled with medication. (Tr. at 336-39.) Physical and mental examinations were unremarkable. (Tr. at 337-38.) He assessed allergic rhinitis, lumbar degenerative disc disease, and anxiety, and renewed her medications. (Tr. at 338-39.)

Claimant returned to Dr. Metzger on May 10, 2012, with complaints of anxiety and muscle spasms. (Tr. at 452-55.) Claimant reported her low back pain at a level eight out of ten and requested stronger pain medication. (Tr. at 453.) Physical exam revealed lumbar spinous and paraspinous tenderness. (Tr. at 454.) Mental status exam was grossly normal. (Id.) Dr. Metzger noted that Claimant smelled of alcohol. (Tr. at 453.) He diagnosed alcohol dependence, anxiety,

8

and medication monitoring. (Tr. at 455.) He prescribed Buspar and Antabuse, and continued her other medications. (Tr. at 454-55.) On November 15, 2012, Claimant returned to Dr. Metzger and complained of gastroesophageal reflux disease ("GERD") and a face rash, and requested that her Antabuse medication be changed. (Tr. at 447-48.) Claimant reported that she drank a lot of beer daily. (Tr. at 448.) She reported that the Antabuse made her sick to her stomach and requested a different medication. (Id.) She also reported that her anxiety was controlled. (Id.) Claimant denied decreased concentration, and physical examination was unremarkable with the exception of mild epigastric tenderness to palpation. (Tr. at 449.) Dr. Metzger noted that Claimant's problems included, inter alia, dysfunctional use of controlled substances and renewed the Antabuse. (Tr. at 450-51.

An MRI of Claimant's spine on December 13, 2012, revealed multilevel degenerative changes, with moderate bilateral foraminal stenosis at the L3-L4 level. (Tr. at 377.) Specifically, at T10-11, Claimant had a disc bulge, which mildly narrowed the central canal and marginated the ventral aspect of the cord. (Id.) She had diffuse bulge with bilateral facet hypertrophy at L1-L2, with mild bilateral foraminal stenosis; mild bilateral facet hypertrophy with mild narrowing of the bilateral neural foramen at L2-3; a diffuse bulge and bilateral facet hypertrophy with moderate right and mild left lateral recess stenosis and moderate bilateral foraminal stenosis at L3-4; a diffuse bulge and bilateral facet hypertrophy with mild bilateral foraminal stenosis at L4-5; and a diffuse bulge with a superimposed tiny central protrusion with mild bilateral foraminal stenosis at L5-S1. (Id.) The x-rays of Claimant's hips revealed no significant osseous abnormality. (Tr. at 409.)

Claimant returned to Dr. Metzger on December 27, 2012, for follow-up of a facial rash and low back pain. (Tr. at 442-46.) She complained of frequent moderate back pain with weakness and

shooting pain down the bilateral lower extremities, in addition to bilateral hip pain. (Tr. at 443.) She again reported that her depression and anxiety were controlled. (Id.) Claimant indicated that she drank "a lot" of beer daily. (Id.) Physical exam revealed thoracic and lumbar spinous and paraspinous tenderness. (Tr. at 444.) The x-rays of Claimant's hips on December 27, 2012, revealed no significant osseous abnormality. (Tr. at 409.)

On January 26, 2013, Claimant presented to the emergency room at Roane General Hospital with complaints of sharp back pain located between her shoulder blades with radiation to the neck and buttocks. (Tr. at 410-18.) On physical exam, it was noted that Claimant had muscle spasms and decreased range of motion of her back. (Tr. at 412.) She was diagnosed with chronic back pain and advised to follow up with her primary care physician. (Id.) Claimant followed-up with Dr. Metzger on January 31, 2013, to discuss attending the pain clinic for her back pain. (Tr. at 438-41.) Claimant continued to report that she drank a lot of beer on a daily basis and reported moderate low back pain. (Tr. at 439.) She denied joint pain or swelling and muscle weakness. (Tr. at 440.) With the exception of lumbar tenderness, her physical exam was unremarkable. (Tr. at 440-41.) Dr. Metzger assessed CTS, DDD of the lumbar spine, and muscle spasm and did not refer Claimant to a pain clinic. (Tr. at 441.)

Claimant was examined by Janice Blake, M.A., a licensed psychologist, on February 7, 2013, on self-referral, after Child Protective Services ("CPS") intervened and her daughter was placed in a treatment facility due to self-destructive behaviors, including sexual contact with grown men and substance abuse. (Tr. at 387-90, 456-59.) Ms. Blake observed that rapport was established easily and Claimant presented with relevant and coherent speech, possessed normal psychomotor activity, and presented with an anxiety level that was elevated to the situation. (Tr. at 388, 457.) Results of the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"), revealed a low "K"

score, which did not allow Claimant's profile to be interpreted because either she deliberately attempted to present herself in an unfavorable light or she was exaggerating her problems as a plea for help. (Id.) The clinical profile on the Millon Clinical Multiaxial Inventory-III ("MCMI-3"), indicated that her responses were a cry for help. (Tr. at 389, 458.) Ms. Blake noted that although Claimant reported that she wanted to work with CPS to get her child back in the home, she withheld information that would have presented herself in a positive light. (Id.) She diagnosed panic disorder without agoraphobia; major depressive disorder, recurrent, severe, without psychotic features; rule out dysthymic disorder; and negativistic (passive-aggressive) traits and features; and assessed a GAF of 55. (Tr. at 390, 459.) Ms. Blake recommended continued individual psychotherapy and referral for psychiatric consultation. (Id.) She further noted that due to Claimant's financial limitations, she would have benefited from a case management program to assist in linking her with available resources. (Id.)

She presented to the emergency room on February 12, 2013, and complained that she injured her right ankle when she fell off a chair while painting. (Tr. at 419-29.) It was noted that Claimant wore a brace on her right wrist for CTS. (Tr. at 425.) Claimant also reported mild back pain. (Tr. at 425.) The x-rays of Claimant's cervical spine revealed only mild disc space loss at C3-4, but no acute abnormality. (Tr. at 432.) The x-ray of her thoracic spine revealed only mild disc space loss in the mid-thoracic spine and the x-rays of her right ankle were normal. (Tr. at 430-31.)

Claimant returned to Dr. Metzger on February 28, 2013, for a follow-up examination regarding her anxiety. (Tr. at 433-37.) Claimant reported that she continued to drink a lot of beer daily and denied focal weakness, memory problems, anxiety, decreased concentration, or sleep disturbances. (Tr. at 434-35.) It was noted that she presented with tenderness in her left plantar

11

fascia. (Tr. at 435.) Dr. Metzger's assessment remained unchanged. (Tr. at 436.)

On March 20, 2013, Ms. Blake submitted a Treatment Summary of the services Claimant received at Psych Services of Roane County, Inc. (Tr. at 460-61.) Claimant received treatment on eleven different occasions from December 18, 2012, through March 19, 2013. (Tr. at 460.) Ms. Blake noted that Claimant would continue to receive services as long as she continued to keep most of her appointments and did not make excuses after she missed an appointment. (Tr. at 461.) Ms. Blake agreed to provide services to Claimant only after Claimant agreed to continue treatment when the difficult issues were confronted rather than terminating services only to return months later for her appointment. (Id.) Ms. Blake noted Claimant's diagnoses included panic disorder without agoraphobia; parent-child relational problems; major depressive disorder, recurrent, severe, without psychotic features; dysthymic disorder; and assessed a GAF of 47. (Id.)

Ms. Blake also completed a form Mental Assessment of Ability to do Work-Related Activities, on which she assessed marked limitations in her ability to interact with supervisors, deal with work stresses, function independently, behave in an emotionally stable manner, relate predictably in social situations, and understand, remember, and carry out complex job instructions. (Tr. at 462-63.) She assessed an extreme limitation in her ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 463.)

On April 29, 2013, Ms. Blake submitted a further Treatment Summary that indicated Claimant had received treatment on four occasions from April 3, 2013, through April 22, 2013. (Tr. at 465-66.) Ms. Blake reported that although Claimant continued to report symptoms, she had gained some insight into how her choices and behaviors related to negative consequences that she had experienced, including decisions regarding her daughter who was in a treatment facility. (Tr.

at 465.) Ms. Blake noted that one of Claimant's poor decisions included a shoplifting charge. (Id.) Ms. Blake determined that Claimant did not meet the criteria for Bipolar Disorder. (Tr. at 465-66.) She further noted that treatment was somewhat beneficial to Claimant as there were "times when she appears to be able to think and respond rationally, even in regard to her daughter's treatment and the treatment providers at the facility." (Tr. at 466.) She continued Claimant's diagnoses and assessed a GAF of 45. (Id.)

On May 10, 2013, x-rays of Claimant's left hand was normal. (Tr. at 467.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to consider whether her mild multilevel degenerative disc disease and L3-L4 stenosis met or equaled Listing § 1.04A. (Document No. 11 at 5-9.) Claimant asserts that treatment notes reflect consistent complaints of chronic back and hip pain and observed spinal tenderness on physical examination. (Id. at 7.)

In response, the Commissioner acknowledges that the ALJ did not address specifically whether Claimant's mild DDD and L3-L4 stenosis satisfied the requirements of Listing § 1.04A. (Document No. 12 at 11.) Nevertheless, the Commissioner contends that any error the ALJ may have committed in failing to so consider, is harmless. (Id. at 12-15.) The Commissioner notes that the ALJ considered Claimant's subjective complaints of pain and determined that they were not entirely credible. (Id. at 12.) His determination was based on the lack of objective evidence support, the lack of intense treatment, an invalid MMPI-2 score due to exaggeration, and non-limited daily activities. (Id. at 13.) Despite Claimant's allegations, the Commissioner asserts that the ALJ considered her December 2012, MRI, which showed only mild degenerative changes and moderate foraminal stenosis. (Id. at 13-14.) The nerve root however, had not been touched, and

therefore, there was no nerve root impingement. (Id. at 14.) The Commissioner asserts that Claimant fails to cite to any evidence demonstrating that she met any of the requisite clinical findings of Listing § 1.04A. (Id.) She notes that tenderness is not a requisite finding. (Id.) Accordingly, the Commissioner contends that "the record plainly did not even come close to suggesting that [Claimant] had the requisite evidence of nerve root compression required by § 1.04A." (Id. at 15.)

In reply, Claimant asserts that the Commissioner has provided a "post hoc rationale that the ALJ did not provide in making his finding at step three of the sequential evaluation or in formulating his RFC. The record does not show that the ALJ weighed all of the evidence cited by the Commissioner." (Document No. 13 at 2.) She further asserts that the Commissioner cannot argue that the Court is able to extrapolate a step three analysis from the ALJ's consideration of Claimant's credibility. (Id.) Accordingly, Claimant contends that the matter must be remanded. (Id.)

Claimant also alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to consider all of her severe and non-severe impairments in assessing her RFC, namely her CTS, bilateral hip pain, chronic headaches, and limited education. (Document No. 11 at 9-10.) She asserts that the ALJ failed to perform a function-by-function assessment or to define additional limitations in her ability to sit, stand, walk, lift, carry, push, or pull that constituted "less than light work." (Id. at 9.)

In response, the Commissioner asserts that the ALJ's RFC determination inherently was a function-by-function assessment of Claimant's capability "given the regulatory and policy definitions of what constitutes light and unskilled work." (Document No. 12 at 15.) The Commissioner notes that the ALJ specifically stated in his decision that he considered all of

14

Claimant's medically determinable impairments, including those that were not severe. (Id. at 16.) Regarding Claimant's CTS, the Commissioner asserts that the ALJ noted the diagnosis was mentioned in a January 2013, progress note; that the record failed to contain any testing that verified the diagnosis; that x-rays of Claimant's left hand were negative; that there was a lack of evidence of any treatment for CTS; and that Claimant reported that she did not have a condition that caused any problems with using her hands. (Id.) Respecting hip pain, the Commissioner notes that the evidence revealed no abnormalities and implicitly was considered in the ALJ's evaluation of her back complaints. (Id.) The Commissioner asserts that respecting Claimant's headaches, treatment notes failed to document any complaints or any significant complaints that warranted medical investigation. (Id.) Finally, the Commissioner asserts that the ALJ considered Claimant's limited education when he determined that there were other jobs in the national economy that she was capable of performing. (Id.) The Commissioner contends that the ALJ was not required to pose additional limitations when he questioned the VE, when there was an absence of a problem. (Id. at 16-17.) Thus, the Commissioner asserts that the ALJ's RFC assessment is supported by substantial evidence.

In reply, Claimant asserts that contrary to the Commissioner's argument, the ALJ found that her CTS, bilateral hip pain, chronic headaches, and limited education were medically determinable impairments. (Document No. 13 at 3.) Furthermore, although the Commissioner asserted that the ALJ completed an inherent function-by-function analysis, he failed to specify the aspect of light work that Claimant was unable to perform. (Id.) The ALJ therefore, "did not define [Claimant's] residual capacities in a way to make it clear what part of light work she could not do, only that she was limited to 'less than' light work." (Id.)

Analysis.

    1.  <u>Listing § 1.04A</u>.

Claimant first alleges that the ALJ failed to consider her mild DDD and L3-L4 stenosis at

under Listing § 1.04A, at step three of the sequential analysis. (Document No. 11 at 6-9.) The

Listing of Impairments describes, for each of the major body systems, impairments that are

considered severe enough to prevent an adult from doing any gainful activity," regardless of age,

education or work experience, <u>see</u> <u>Sullivan v. Zebley</u>, 493 U.S. 521, 532, 110 S.Ct. 885, 892, 107

L.Ed.2d 967 (1990); 20 C.F.R § 416.925(a) (2013). Section 1.04 of the Listing of Impairments

provides criteria for determining whether an individual is disabled by disorders of the spine. Such

spinal disorders include, but are not limited to, a herniated nucleus pulpous, spinal arachnoiditis,

spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, and vertebra. 20 C.F.R. Pt.

404, Subpt. P, App. 1, § 1.04 (2013). The required level of severity for Listing § 1.04 is satisfied

when the claimant has a disorder of the spine resulting in compromise of a nerve or the spinal cord

with any one of the three following requirements:

> A.   Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

> OR

> B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dyesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

> OR

16

C.      Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

In his decision, the ALJ concluded at step three of the sequential analysis that Claimant's impairments did not meet or medically equal the criteria of Listings 12.04 and 12.06. (Tr. at 111.) The ALJ however, as the Commissioner concedes, did not specifically discuss in his decision, whether Claimant's mild DDD and spinal stenosis met or equaled Listing § 1.04A. As Claimant aptly points out, the Court is limited to determining whether the Commissioner's findings are supported by substantial evidence." See Hays v. Sullivan, 907 F.2d at 1456. In this case, the ALJ made no findings regarding Listing § 1.04A. The Court therefore, would be constrained to substitute its judgment for that of the Commissioner, despite any findings that the ALJ may have made regarding Claimant's credibility. For this reason, the undersigned finds that remand is necessary to determine whether Claimant's mild DDD or spinal stenosis at L3-L4, met or equaled Listing § 1.04A.

2.  RFC Assessment.

Claimant also alleges that the ALJ failed to consider all her severe and non-severe impairments in assessing her RFC. (Document No. 11 at 9-10.) "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2013). "This assessment of your

remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Specifically, Claimant contends that the ALJ failed to perform a function-by-function analysis of her impairments when he limited her to performing "less than light work." In Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015), the Fourth Circuit observed that SSR 96-8p "explains how adjudicators should assess residual functional capacity. The Ruling instructs that the residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." It is only after the function-by-function analysis has been completed that RFC may "be expressed in terms of the exertional levels of work." Id. The Court noted that the ruling must include a narrative as to how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. Id. The Fourth Circuit further noted that a per se rule requiring function-by-function analysis was inappropriate "given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested." Id. Rather, the Fourth Circuit adopted the Second Circuit's approach that "remand may be appropriate...where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id. (*Citing* Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013));

see also, Ashby v. Colvin, Civil Action No. 2:14-674 (S.D. W.Va. Mar. 31, 2015).

Though the Commissioner contends that the ALJ's function-by-function analysis was inherent in the Regulation's definitions of unskilled, light work, the undersigned finds that the ALJ failed to identify what aspects of light work that Claimant was unable to perform. The only physical limitation that the ALJ assessed as "less than light work" was a limitation to occasional postural activities. (Tr. at 112.) The ALJ did not discuss Claimant's ability to sit, stand, walk, lift, carry, or push. Claimant therefore, is left to speculate as to what functions the ALJ found her capable and incapable of performing that constitutes "less than light work." Accordingly, pursuant to the holding in Mascio, the undersigned finds that remand is necessary for further consideration of Claimant's RFC.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 11.), **DENY** the Defendant's Motion for Judgment on the Pleadings (Document No. 12.), **REVERSE** the final decision of the Commissioner, **REMAND** this matter pursuant to sentence four of 42 U.S.C. 405(g) for further administrative proceedings for further consideration of Claimant's impairments at step three of the sequential analysis and of Claimant's RFC, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of

objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: February 1, 2016.

_____

Omar J. Aboulhosn
United States Magistrate Judge